UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

SUSAN BORLAND,

        Plaintiff,

v.                                                                 Case No. 13-C-738

CAROLYN W. COLVIN,

        Defendant.

---

## DECISION AND ORDER

This is an action for review of the final decision of the Commissioner of Social Security denying Plaintiff Susan Borland's application for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act. Almost four years ago, the court reversed an unfavorable decision by the Commissioner of Social Security and remanded the case for further proceedings based on the court's conclusion that Administrative Law Judge (ALJ) Mary L. Everstine had relied on a misstatement of the 2009 opinion of one of Borland's treating physicians. (Tr. 509–531.) On remand, the case was assigned to ALJ Ira S. Epstein. ALJ Epstein conducted a limited rehearing and again denied Borland's application which had been modified to cover a closed period from 2003 to 2010. ALJ Epstein's decision became the final decision of the Commissioner when the Appeals Council denied review. For the reasons given below, the decision of the Commissioner will be affirmed.

### BACKGROUND

Borland's employment and medical histories are set forth at length in the Court's previous decision and will not be repeated in detail here. (Tr. 510–15.) In sum, Borland injured her right

knee at work in 2001 and, despite a number of surgical procedures by several different orthopedic surgeons and other conservative courses of treatment, she had experienced pain in her knee up until she underwent a knee replacement in late 2009. Due to an infection after her second surgery and her relatively young age, various doctors had previously advised against a knee replacement, though more than one thought the procedure would eventually be needed.

In Borland's previous action for judicial review, she claimed that the ALJ failed to properly assess her physical and mental residual functional capacity (RFC), erred in her credibility analysis, and failed to incorporate all of her limitations in the hypothetical question she posed at Step Five of the Agency's sequential analysis. I thought that the ALJ had mischaracterized the opinion of Dr. Roy Buck, one of Borland's treating physicians who performed the fifth surgery in early 2009, and thus reversed and remanded the case for further proceedings. I concluded a remand was necessary because even though there was other evidence in the record that supported the ALJ's conclusion, the ALJ had intimated that Dr. Buck's opinion was entitled to greater weight than those provided by the other physicians because of when he rendered it. (Tr. 521–22 ("[S]he also suggested that his opinion was entitled to greater weight because it was offered 'AFTER her most recent surgery and AFTER she had reported in June 2009 that she had done well until a couple of weeks prior when she had some increased pain.'" (quoting Tr. 14.)). For me to rely on the other doctor's reports to support the ALJ's decision, I concluded, would violate what the Seventh Circuit has come to refer to as the *Chenery* doctrine. *See, e.g., McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010) (noting that " it improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on in its decision" (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)). The Commissioner's decision was therefore reversed and the case remanded for further proceedings.

2

At the rehearing, Borland's attorney informed ALJ Epstein that Borland now sought benefits only for a closed period from June 13, 2003, through May 23, 2010, because she no longer claimed she was disabled. On December 15, 2009, Dr. Ilan Shapiro, performed the long-awaited knee replacement surgery. (Tr. 669–70.) Borland provided additional medical records related to this surgery to ALJ Epstein during the hearing. (Tr. 468.) After the surgery, Borland participated in physical therapy from December 2009 to February 2010. (Tr. 616–31.) The records from physical therapy show steady improvement with an increased range of motion, decreased pain and stiffness, and improved ability to tolerate exercise and activity. (Tr. 628–31.) She started working full-time in May 2010, while her previous case was pending, and was now working for a foundry doing maintenance inventory. (Tr. 467–70.)

Borland then briefly described her medical history and previous work, both as a head cook for Smuckers for 11 years and a stint as a cook at a restaurant for a few months in 2006. (Tr. 470–72.) Regarding her symptoms during the closed period of alleged disability, Borland testified that standing for any length of time was painful and that her pain was better on some days than others:

> Each day was different. You know, it all revolved around weather. It all revolved around, you know, just circumstances. Sometimes I could stand for an hour but then I'd need to sit down and rest. It, it was never the same thing, you know. It was just, it hurt on and off constantly and when I needed to sit, I needed to sit and when I needed to stand, I needed to stand. I needed to stretch it out and move it because it would hurt sitting too long too.

(Tr. 472.) She further testified that she could probably sit for a half an hour and then she would "have to prop it up." (Tr. 473.) She propped her knee up by laying on a couch with a pillow under the back of her knee. (Tr. 475.) Borland also indicated that the pain was always present and limited

3

her to light housework like simpler meals, but she was able to care for several older foster children. (Tr. 474–76, 477.) Borland's attorney did not ask any questions because ALJ Epstein reminded the attorney that the remand was limited and indicated that the period had "been gone over and decided already." (*Id.*)

In his decision after remand, ALJ Epstein thought that in reversing the Commissioner's previous decision, the court "may have misunderstood Administrative Law Judge Everstine's finding and rationale." (Tr. 453.) In ALJ Epstein's view, the finding that Borland could do sedentary work so long as she could "occasionally stretch her right leg" was not based on Dr. Buck's opinion, but rather a "conclusion based upon a careful review of all of the evidence" and a recognition that the opinion "came well after claimant's alleged onset date." (Tr. 454.) In any event, ALJ Epstein found based on the entire record that throughout the closed period Borland had retained the RFC "to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) provided that she had the opportunity to occasionally stretch the right leg/knee." (Tr. 456.)

Based upon the medical record of evidence and the testimony adduced at the hearing, ALJ Epstein then proceeded to apply the familiar five-step sequential evaluation process mandated by the Social Security regulations. *See* 20 C.F.R. § 404.1520. He found that Borland did not engage in substantial gainful activity during the closed period. At step two, ALJ Epstein found that Borland had the following medically determinable severe impairments: "Degenerative joint disease of the right knee with multiple surgeries, including most recently knee replacement surgery, aggravated by obesity." (Tr. 456.) He then concluded that none of her impairments, alone or in combination, met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. ALJ Epstein found that Borland had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a)

4

provided that she the opportunity to occasionally stretch the right leg/knee." (*Id.*) At step four, he found that Borland was unable to perform her past work, and thus proceeded to step five where he found that Borland was not disabled because she retained the RFC to perform a significant number of jobs that exist in the national economy.

In this appeal, Borland argues that the ALJ erred in assessing the weight to accord her treating physicians, in determining her RFC, and in formulating his hypothetical question to the vocational expert. She contends that ALJ Epstein cherry-picked from the record, ignored important evidence, and substituted his opinion for those of the medical sources. As a result, Borland maintains that ALJ Epstein improperly discounted the opinion of Dr. Buck, whose 2009 opinion indicated that Borland was incapable of even sedentary work due to her right knee.

**ANALYSIS**

On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind could accept as adequate to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v.*

5

*Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

**A. Opinions of Treating Physicians**

In determining Borland's RFC on remand, ALJ Epstein gave Dr. Buck's opinion concerning her limitations "only limited weight." (Tr. 454.) Borland contends that in doing so, the ALJ failed to comply with the treating physician rule set forth in SSR 96-2p. She argues that the ALJ failed to explain how Dr. Buck's opinion was inconsistent with the other medical opinions and why his was entitled to less weight even if it was inconsistent. She also contends that the ALJ failed to state what weight he did give Dr. Buck's opinion. Overall, she argues that the ALJ failed to build a logical bridge to his conclusion that Dr. Buck's opinion was entitled to only limited weight.

An ALJ must give controlling weight to treating source opinions that are "well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with other substantial evidence in the case record." 20 C.F.R. § 404.1527(c)(2); *see also Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). "Not inconsistent" carries a specific definition according to the SSA:

> This is a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion.

6

SSR 96-2p, 1996 WL 374188, *3 (July 2, 1996). More weight is given to the opinions of treating physicians because they have greater familiarity with the claimant's conditions and circumstances. *Clifford*, 227 F.3d at 870. If the ALJ discounts the opinion of a claimant's treating physician, the ALJ must offer "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

The reason for giving greater weight to the opinions of treating physicians is that they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). At the same time, "a claimant is not entitled to disability benefits simply because his physician states that he is 'disabled' or unable to work." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The Seventh Circuit has cautioned that treating physicians may bring their own biases to the evaluation. *See id.* ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability."). Thus, the ALJ need not blindly accept a treating physician's opinion—he may discount it if it is internally inconsistent or contradicted by other substantial medical evidence in the record. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

Borland had several treating physicians over the course of the long history of her right knee impairment, including Dr. R. Jones, who first treated her for her knee injury in 2001; Dr. Leo Kaplan and Dr. Richard Illigen from the University of Wisconsin Department of Orthopedics and Rehabilitation who treated her in 2003; Dr. Craig Bately, an osteopathic physician who treated her

7

for pain in 2008; and finally Dr. Shapiro, who performed the knee replacement surgery. Dr. Buck's treatment of her was actually quite limited. He is the orthopedic surgeon who performed the last of five arthroscopic surgeries she had on her right knee between 2001 and 2009. The record contains little more from Dr. Buck than his operative report of the surgery he performed on Borland at the Mercy Medical Center in Oshkosh on February 26, 2009. (Tr. 395-97.) The only other pertinent record is a "Medical Source Statement (Physical)" apparently presented to Dr. Buck by Borland's lawyer. (Tr. 401.) This form appears to have been completed and signed by Dr. Buck on August 6, 2009, and is the primary medical source of the limitations on which Borland relies for her claim that she was unable to perform the limited range of sedentary work throughout the period from 2003 to 2010. The ALJ did not err in according it "only limited weight."

In his decision, the ALJ noted that Dr. Buck's opinion was "rather inconsistent with the majority of opinions, especially as it relates to lifting." (*Id.*) In support of this conclusion, ALJ Epstein cited the report from Dr. David Jones, an orthopedist who opined in October 2003, four months after Borland's alleged onset date, that she could sit for eight hours; stand for three hours and sit for three hours with the ability to alternate positions; lift twenty-four pounds frequently and thirty-four pounds occasionally; but should avoid bending, squatting, stopping, crawling, crouching, or kneeling. (Tr. 333, 451–52.) ALJ Epstein also cited the report of Dr. Ward Jankus (mistakenly referred to as Jenkins), a consulting physician who a took a history and conducted a physical examination of Borland in November 2007. Dr. Jankus noted only Borland should avoid excessive pressure on her knee, including kneeling and crawling, and would need to "intermittently alternate her position up and down off her feet." He imposed no lifting restriction. (Tr. 355–357.) Finally, the ALJ referenced the December 2007 report Dr. Syd Foster of the Wisconsin Disability

8

Determination Services. Dr. Foster concluded from his review of Borland's medical file that she could occasionally lift ten pounds and frequently lift less than ten pounds, stand or walk at least two hours in an eight-hour day and sit about six hours. The only other limitation Dr. Foster noted was that she should never crawl. (Tr. 358–365.)

Earlier in his decision, the ALJ had referenced the report of Dr. Bentson, who had seen Borland for an orthopedic examination in January 2008. Borland reported that she had problems with prolonged sitting, walking, standing, bending and twisting. Dr. Bentson noted that physical examination for the left knee was negative. For the right knee, there was full range of motion, no swelling or instability, but some tenderness and positive McMurray sign. Dr. Bentson opined, however, that arthroplasty was not warranted. (Tr. 452.) It was the following year that Borland saw Dr. Buck, and this was in response to her complaint that she had experienced a sudden episode of pain and locking of her right knee on February 8, 2009. (Tr. 395.) Dr. Buck performed surgery later that month in which he removed a loose body and trimmed and smoothed some of the arthritic joint surfaces. (Tr. 396.) As the ALJ noted, no treatment notes by Dr. Buck follow. (Tr. 453.) In fact, there are no other reports by Dr. Buck except the physician statement he signed some six months later. Four months later, Borland had the knee replacement and shortly thereafter returned to work.

Based on this record, Dr. Buck's opinion concerning Borland functional capacity was not deserving of controlling, or even significant weight. Dr. Buck performed arthroscopic surgery on her right knee. Nothing in his report suggests that he performed any test or examination, or viewed any report, to determine how much weight she could lift or how long she could stand, walk or sit six months after he performed the surgery. Indeed, nothing in his reports indicates he even asked

9

Borland what she could do. Moreover, as the ALJ also noted, Dr. Buck's opinion came significantly after the alleged onset date and so would have no relevance to her condition before 2009. (Tr. 454.) Given the other medical opinions and the absence of medically acceptable clinical and laboratory diagnostic techniques supporting it, the ALJ did not err in his assessment of Dr. Buck's opinion even for the brief period of time it covered.

**B. RFC and Hypothetical**

Borland also argues that the ALJ erred in determining her RFC and in formulating the hypothetical question he posed to the vocational expert. She contends that the ALJ failed to identify her functional limitations or restrictions and assess her work-related abilities on a function-by-function basis. In other words, Borland contends that the ALJ was required to make specific findings as to the weight she could lift occasionally and frequently, the length of time she could sit, stand or walk, and any other functional limitations, and only then determine her RFC. She contends that the ALJ is required to do so by SSR 96-8p. Borland also contends that the ALJ erred in failing to include in the hypothetical question he posed the vocational expert the specific functional limitations that the evidence supported.

Borland's first contention that the ALJ was required to make specific findings as to each functional limitation has been rejected by the Seventh Circuit. *See Zatz v. Astrue*, 346 Fed. Appx. 107, 111 (7th Cir. 2009) ("Although the ALJ could have been more explicit in his findings, his duty under SSR 96–8p is not as onerous as Zatz suggests."); *see also Knox v. Astrue*, 327 Fed. Appx. 652, 657 (7th Cir. 2009) (noting that "[a]lthough the 'RFC assessment is a function-by-function assessment,' SSR 96–8p, the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions

10

is sufficient"). It is true that SSR 96-8p requires the ALJ to "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis" before expressing the claimant's RFC in terms of the exertional levels of work. But the ruling does not state that the ALJ must expressly and separately set out such findings in his decision. While the ALJ did not make express findings as to Borland's ability to lift, sit, stand and walk, he did limit her to sedentary work with the additional limitation that she would have the ability to occasionally stretch her right leg/knee. "Sedentary work" by definition limits the individual to primarily sit-down work involving lifting of no more than ten pounds. 20 C.F.R. § 404.1567(a).

While it may have been better for the ALJ to make explicit his findings on a function-by-function basis before expressing Borland's RFC in terms of the exertional level of work she was capable of performing, I conclude from my review of the record that the ALJ implicitly found that Borland was not limited except as expressed in the RFC. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary."); *see also Depover v. Barnhart*, 349 F.3d 563, 567–68 (8th Cir. 2003) (holding that ALJ's failure to first express claimant's work-related abilities on a function-by-function basis did not require remand where required findings were implicit). Under the circumstances of this case, there is no need to remand to make the findings more explicit.

Borland is also mistaken in her contention that the ALJ erred in failing to incorporate all of the limitations into the hypothetical question he posed to the vocational expert. He asked the expert to assume a person of Borland's age, education and experience who was limited to sedentary work but also "[e]xpressly should avoid stooping, crouching, crawling, kneeling; avoid walking on uneven

11

terrain; and should be able at the workstation to stretch the right leg out occasionally but can do that while sitting at the workstation or just standing in place." (Tr. 493.) These are the only functional limitations the ALJ found, and the evidence easily supports his findings, as I explained in my earlier decision. (Tr. 524–30.)

Borland had a bad right knee. The records shows this was her only significant impairment. Once the bad knee was replaced, she was able to return to work. The RFC and hypothetical posed by the ALJ fully takes her impairment into account. Substantial evidence supports the decision of the Commissioner that she was not disabled between 2003 and 2010. Accordingly, the decision of the Commissioner is affirmed.

## CONCLUSION

For the reasons set forth above, the Commissioner's decision is affirmed. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** this   22   day of September, 2014.

                                     s/ William C. Griesbach
                                     William C. Griesbach, Chief Judge
                                     United States District Court